Good morning. I'm Gregory Evans on behalf of ASARCO. On December 10th, 2009 in Washington, DC, the United States Environmental Protection Agency and the Department of Justice held a press conference. In that press conference, they announced the closure of ASARCO's bankruptcy, which they described as one of the most successful environmental bankruptcies in United States history. Here is what they said. And I quote, from the head of the Environmental and Natural Resources Division of the Department of Justice, quote, just because a company goes into bankruptcy does not mean that it will avoid its environmental responsibilities. That company was ASARCO. Quote, taxpayers received more than a dollar for every dollar they claimed. Those taxpayers are the American citizenry. Why do any of those statements have relevance? Those statements have relevance, Your Honor, because in its zeal to win, Union Pacific spends a lot of time both in the trial below and in the briefs that they have filed, disparaging ASARCO as a company that somehow tried to get a good deal, as a company that tried to defraud its creditors and avoid its environmental responsibility. And so we'd look to a third party to validate what I am saying on behalf of this client. I'll just be speaking for myself. I could care less about any of those atmospherics. I'm focused just on the legal issues that are presented to us, Your Honor. So I'd suggest you jump right into that rather than give us these highfalutin sounding quotes. Let's then go to that. And I understand. And maybe it would help to start with the release. I mean, the district court said that you had released your claims. We said, no, the release is ambiguous. You have to look at intrinsic evidence. It had a 13-day trial. Why was it wrong in what it found? I will go then to the release. And if I could reserve two minutes of my time on rebuttal, I would be happy to do that. As to the issue of the release, the court erred. And the court did so because it erroneously overlooked what this court said on appeal about the settlement release. This court said that that release was ambiguous. This court directed the court below to consider parole evidence. This court, in fact, went further and identified the very language in the release that it identified as ambiguous and which allowed the contract to be read in the way that ASARCO was reading it. In fact, the court rejected the words used by the district court that the release, if read the way ASARCO was reading it, renders it, and I quote, anything but mutual. And Your Honors, we see the same language again. We see the same language in the judgment, in the opinion of the court below. And we know that the court below disregarded the instruction of this court to consider the parole evidence. Well, wait a minute. There was a 13-day trial. There was a lot of testimony. The court listened to it. Can you, obviously the factual mistakes that you're talking about have to be clearly erroneous. So can you point to the facts that the court found that you think were clearly erroneous? Well, I, respectfully, Your Honor, I'm not so sure that the clearly erroneous standard applies to the factual finding of the district court if the district court, according to the cases cited in the brief, has made a mistake of law. And the court was mistaken on the law in two important respects. Number one, the court used Texas law to determine whether there was a meeting of the minds with respect to the precise release language that the court, this court, found to be ambiguous. The second mistake of law that was made was the court, the court conflicted with the very instruction given by this court in the reported DeSarco case to listen to the parole evidence. In fact, if we look at the opinion, there is no citation of the parole evidence in terms of any kind of a substantive review of what was said. Let's look at what was said. I think, I mean, just to be fair to the court, you're right that the court did repeat, unfortunately, that language that we had said should not have controlled the analysis. But what the court said was, listen, I obviously started out thinking that the plain language of the release covered this. I was rebuked. I've now held this trial. Everything I listened to just confirms my initial instinct, which is that this was intended to be covered. And you're right. Maybe the court didn't go through and cite, you know, page and line numbers. But as Judge Rothstein said, I mean, this judge has been living with this case for a long time. He did what we instructed him to do. And I don't think we should just assume that he ignored all of this evidence, which is kind of what you're suggesting. Well, what I'm saying with respect to both courts, this court's instruction that he considered, that the district court consider the parole evidence. And with, of course, respect to what the district court did, I would concede that the court listened to the parole evidence. In fact, days of it. But never really grappled with it. Because if you look at what the parole evidence said in the record, the parole evidence uniformly established that it was not a Sargo's intent to release this claim. And that would be consistent with the language that this court on remand identified as being ambiguous. Let me just, I'm sorry, go back quickly. You're going back again to the wording of this court and sending it back. I think, I'm sorry, but I think what we are asking you for, what are the mistakes the court made? What did it ignore in terms of actual factual evidence it heard? What did it ignore? I think what you're saying is the court really had made up its mind the first time around, 13 days of testimony later, all it did was reaffirm what it thought before it went into it. District judges sometimes do that, but if it would help us, if you could point to things that it ignored. Yes, Your Honor. Let me, let me in fact call the roll. Linda Larson, Thomas Aldrich, Christopher Fall, Robert Jones, the railroad's witness, Michael Cooper, the railroad's witness. That is what the district court ignored. Let me run through briefly what it ignored. Linda Larson, a respected Seattle environmental attorney, waived the attorney client privilege with ASARCO's permission, took the stand and told all. She said in trial that it was never ASARCO's intent to release this claim. She testified that ASARCO never contemplated such a waiver. And in fact, she testified that ASARCO never authorized her to commit to such a waiver. That was Linda Larson's testimony. The attorney representing ASARCO who waived the attorney client privilege to be able to tell this to the court, the information that the court was instructed to listen to by this court. But she also, I mean, I'm looking at SER 442, I mean, and this is Ms. Larson sending a letter to her counterpart at Union Pacific, ASARCO is prepared to resolve all claims between it and Union Pacific. I mean, isn't it a reasonable inference from that? I mean, I take your point that there's no evidence either way of specifically bearing on this claim, but there's a lot of evidence from both sides that the point of this provision was to wipe the slate clean and eliminate any future litigation. Yes, Your Honor. But if we look at the context of that correspondence and other correspondence, which by the way, documentary evidence came in as parole evidence and testimony also came in. The documentary evidence again, refers to, puts it in context to the proof of claim, the amended proof of claim filed by Union Pacific in the bankruptcy. It doesn't talk about any claim filed by ASARCO. It doesn't talk about any anticipated claim by ASARCO. And if I might just add one of the most important pieces of the documentary evidence that came in was some of the, some of the drafts that were exchanged. One of which omitted language that said the release was including, but not limited to, including, but not limited to the proof of claim claim. So the not limited to language was omitted by the parties in negotiations. And that omission, according to Ms. Larson, who testified, was actually helpful in confirming her intention and the client's intention at the time, not, not that this, that this release would extend beyond to any other matter other than what, which was stated in, in the release. Okay. Can I just ask you on that point? Cause I, this is what is confusing me. The, the claim that was at issue in Union Pacific's proof of claim against ASARCO, was a contribution claim for this exact same pool of environmental contamination? No, no, no, it was not. Okay. Tell me how it was not. It was different. It, it, the claim had two elements to it. The claim had the first element related to freight, commercial freight charges. So ASARCO filed bankruptcy. Okay. So, so, so that's, so that's, but that was a big part of it. The second was that Union Pacific claimed that along its main line, that mining waste had washed up and, and contaminated its main line such that they were owed a certain sum of money. And I thought it was a contribution claim because they said we have been forced to pay cleanup costs. Yes, we have. Yes. And we think you guys are, are partly responsible and we want to get some of that money back from you. Yes. And I, and I thought the environmental cleanup that was at issue was, is the same. Different site. Different site? Yes, Your Honor. Help, help me understand. Yes. So, so there's the North Fork of the Coeur d'Alene River and then there's the, the, the South Fork. Union Pacific's main line, according to the evidence, runs along the South Fork and their proof of claim related to the washed up tailings along the South Fork. This claim is about the railroads that Union Pacific built with 2.5 billion tons of more toxic mining waste called tailings. They use it to build, maintain and construct and, and to repair their railroads throughout the North Fork, which is a longer stretch of river than the South Fork. And that relates to Operable Unit 3, which is what this, this case is about. The claim that they were making related to the South Fork and the impacts that Asarco's, they claim that Asarco's and other mining companies activities had upon their main line because they were forced to pay to clean up that property. I thought that was all within OU3. Well, it, it, it is not within OU3. I, or at least this portion of, of OU3. But I guess what doesn't make any sense to me from your, the position you're trying to defend is that if they had a contribution claim against you and they were going to settle that, it wouldn't make any sense for them to do that. If you were just going to turn around and bring a contribution claim against them, right? That the whole deal is that, well, we're going to resolve our differences and I'm going to give up, you know, at least some of the money that I'm seeking from you. But if you could just turn around and sue me to get back even more than that, what, what have I gained from the settlement? Well, at the time Union Pacific had not disclosed to anyone it's ubiquitous use of mining waste along the North Fork. In fact, they denied it until it was proven at trial. At the time Union Pacific was disavowing the abandoned railroads that it's companies built along the North Fork. So it was not in their interest to raise North Fork impacts. But this case is about North Fork impacts. And by the way, if, if Union Pacific had paid for and settled its claims with the United States with respect to the North Fork impact, it would have received contribution protection under CERCLA. And they, they did not receive contribution under CERCLA for the impacts of the North Fork railroad system. They only received contribution protection under CERCLA for the South Fork cleanup. So that's the important distinction. The other, the other important point is while it may have been good business judgment to have considered within the context of the, the settlement of the proof of claim filed by Union Pacific, why does the release constantly say claims by Union Pacific against the SARCO again and again and again? And that's the ambiguity that this court found, which they directed the district court to address and which the witnesses did address. And uniformly, the witnesses testified that there was no meetings of the, no meeting of the mind with respect to, to, to the release. And I, if I may continue, the, the other witnesses that testified, Christopher Fall and Tom Aldrich, who signed the agreement, corroborated exactly what Ms. Larson said. So there has been nothing in the, in the court below that contradicts what Ms. Larson said, having waived the privilege and what contradicts what Mr. Aldrich said and what contradicts what Mr. Fall said. But very, very importantly, as the court tries to grapple with the sensibility of this kind of deal, I would add that it was Mr. Fall and Mr. Aldrich who testified in this trial that it was very important for a SARCO to retain the right to pursue Union Pacific later with respect to this portion of the Superfund site. And they did so. How did they do so? If it was so important and you have, I don't know, I think you've mentioned at least six, maybe 10 attorneys. Why didn't they say so? Why didn't they specifically reserve the right to bring a contribution claim? And they did, Your Honor. Where? In the seventh plan of reorganization confirmed by the bankruptcy court and confirmed by the district court, a SARCO preserved its right to pursue contribution under CERCLA for this very site that is at issue in this very case. That claim was preserved. And importantly, if you look at the sequence of it, Your Honor, it was preserved after this settlement agreement was entered into. So if it was, if it was contemplated by the parties that there would be this mutual release, why then would a SARCO include in its seventh plan of reorganization a preservation of that right, which it did? It preserved its right to pursue this, this claim. I want to add, if I may, talking again about the parole evidence briefly, something said by Union Pacific's witnesses on the issue. They called a man named Michael Cooper, who was their retained environmental expert. Michael Cooper testified that he was never asked to evaluate a SARCO's claims against Union Pacific, and that he was only asked to evaluate Union Pacific's claims against the SARCO. And that kind of bears itself out, does bear itself out in the agreement. Union Pacific's claims against the SARCO. Nowhere in the agreement does it address specifically or even inferentially a SARCO's claims with respect to this site against Union Pacific. He testified as an environmental expert that he evaluated the environmental impacts along the South Fork of the Coeur d'Alene River. Not anything about the North Fork, not anything about Union Pacific, about a SARCO's potential claims against Union Pacific. And so if you have an environmental expert and you claim, as they did, as they argued in their briefs, that this was a set off situation and where the parties were negotiating over the differences between two sites, and that there was some brilliant reduction in the amount of the claim because, you know, they all understood what the competing claims were. The very environmental expert that came forward and testified at this trial said he never considered it. He never looked at a SARCO's claims against, against Union Pacific. Perhaps bad business judgment, but those are the facts. And those are the facts that this court ignored, that the low, not this court, excuse me, your honors, that the lower court completely ignored. We can't look to that opinion and find references to Fall, to Aldrich, to Larson, to Cooper, or to Jones. Jones was another witness that they, that they brought forward. He said they never discussed it. He was an attorney that they brought forward and his, his testimony is also compelling because he told this court, and this court listened, he told this court that a SARCO's claims against, against Union Pacific were never discussed. And that's the parole evidence. And that's the parole evidence that this court overlooked. No intent to release the claim, no meeting of the minds as to a release by a SARCO, of a SARCO's CERCLA contribution claim for this site. The district court ignored the parole evidence and repeated its textual analysis and concluding, and concluded that the reading that a SARCO is anything but mutual. This court didn't explain how its interpretation of the contract once rejected by this court can be read consistent with the parole evidence and with the language that is in that agreement, Union Pacific's claim against a SARCO. Quickly, I'd like to touch on the Texas law that applies. I think I'll have to do that. Would the court like me to address the, the, the first argument that we make, which is, which is that the court used the wrong standard? Are you talking about the merits claim or on the waiver, on this waiver issue? Oh, no, not on the issue of waiver. I was at- No, no, the merits issues were very well briefed. You can tell that we're most focused on the waiver issue for now. You've addressed that well so far. Why don't we stop? We'll hear from your opponent. We'll give you a couple of minutes for rebuttal. Good morning, your honors. May it please the court. Carolyn McIntosh from Squire Patent Boggs on behalf of Union Pacific Railroad Company. The district court judgment is based on two independent and primarily fact-based holdings. Unless the district court erred on both of those holdings, this court must affirm. The district court did not err with respect to either of those holdings. And we request that this court affirm for both independent reasons. First, when this case was last appealed, this court found that the bankruptcy settlement agreement between ASARCO and Union Pacific was ambiguous as to whether the settlement released ASARCO's claim. This court remanded for the district court as fact finder to resolve that ambiguity based upon the extrinsic evidence of the party's intent. At trial, the district court did exactly what this court instructed it to do. On remand, after extensive review of extrinsic evidence, the district court made the factual determination that ASARCO released the claim against Union Pacific in the bankruptcy settlement. Can you pause there and just address your opponent's argument that one of the legal errors that infects the factual findings that you've just mentioned is that the district court thought that Texas law only required a meeting of the minds for contract formation purposes, when in fact, because we looked at the cases, they were very clear. It's consistent with the way it works in every state. You've got to have a meeting of the minds as to the specific term that's in dispute. The district court has a footnote that just completely gets that wrong. Why is it that we're able just to overlook that in your view? Well, the meeting of the minds issue is for contract formation and the court found that the contract was valid. There was an offer acceptance, an amount of money decided, the contract was approved by the bankruptcy court and it was implemented by both parties. That's a necessary but not sufficient condition to form a contract. What you also need is a meeting of the minds of the two parties as to what this specific term encompasses. It's not enough if you all have your people who say, well, we thought it meant this and they have their people say, well, we thought it meant that and there's no meeting of the minds as to the . . . That's what I think the district court got wrong as a legal matter. I'm wondering how do you explain, why are we able to affirm notwithstanding a pretty glaring legal error in the district court's analysis? Your Honor, I don't think that that was a legal error in that the meeting of the minds issue is for contract formation. Under Texas law, they . . . Are we not communicating? Because I'm agreeing with you on that. I'm saying that is necessary. Yes. And the district court thought that's all that you needed, but it's not. You need in addition a meeting of the minds as to the specific term and the district court seemed to think, no, I don't need to resolve, I don't need to find that you all actually met as to the meaning of, of whether this term encompassed the, right? And that seems wrong. In, in resolving an ambiguous contract, the fact finder is to weigh the, the extrinsic evidence and it, it is, this court determined that the ambiguity related to whether or not the release provision released a Sarko's contribution claim, the, the fact that ultimately a Sarko said they intended one thing and Union Pacific said it intended something else doesn't mean that a meeting of the minds was required with respect to that specific provision. Rather the reason . . . To form an enforceable contract, the parties have to agree as to what the term in dispute means, right? And yes, I, the material terms must be agreed to. Okay. The scope of the release stated . . . Is the material term we're fighting about? Well, the scope of the release is, is explicit in that the scope of the release states . . . It's not explicit. It's ambiguous. We said that, that's what the whole trial was about. Yes. So I'm asking you, so I, I, and I'm, if you, if what you're going to say is that just because their people said, well, we never intended to release that claim, that the district court doesn't have to credit that. I grant you that, but the court does have to say, I think, well, that's what you guys are saying now. I don't believe it. I think at the time you all were negotiating this, you really did have in mind that it was going to encompass this claim as well. And here, here are my reasons why. And what I'm saying, I guess, is that the district court never seemed to give us here are the reasons why, because it had this footnote saying, I don't need to worry about this meeting of the mind stuff because that is only relevant for contract formation purposes. Actually, the court did say exactly what the reasons were that, that the court determined that. And what it did was it concluded that there were competing, there was competing extrinsic evidence. So it weighed that in the context of the contract itself. And the reasons, the reasons that it stated, or to support its conclusions were first that the, while the proofs, while the whereas clauses or recitals focused on the proofs of claims, the release itself was much broader than that. It was a broad form release of all, all claims of any kind or character in law or inequity known or unknown. And those claims related to the past costs at Wallace Yard, Wallace, at Wallace Burr and Wallace Branch, which are in OU3 and with respect to the CDA site as a whole for past and future costs. So the court found that the release defined the scope of the party's intent and that the correspondence in leading to, or the negotiations leading to the settlement agreement also defined the fact that both parties intended a global release of all claims between them. And they didn't say a global release of Union Pacific's claims. They, they both said in December of 2007, Union Pacific said a global release of all claims between ASARCO and Union Pacific, ASARCO mirrored that language in its settlement offer in April of 2008, saying that, that in both instances, the parties agreed it would be subject to mutual releases and a global settlement of all claims between them. The, some of the most, some of the most compelling evidence that the court relied on is the conduct of the parties after the settlement was implemented. And there, this was a very contentious bankruptcy. The debtor at the pendant, during the pendency of the litigation was also, had also filed a fraudulent transfer claim against the parent, which it ultimately won. So the debtor and parent were very contentious. They had competing plans of reorganization. And so there were two plans of reorganization that went to near final. Ultimately, it was the parent's plan that was confirmed. But the debtor's plan, Union Pacific and ASARCO in negotiating the bankruptcy settlement, all that negotiation was with the debtor, not the parent. The parent wasn't involved at all. And the debtor's plan, it's sixth amended plan of reorganization, didn't reserve any claims. Well, I was confused. I have the sixth plan. I don't have the seventh plan that your opponent referred to. What's that? The seventh plan is the parent's plan. And the parent's plan was confirmed. But the parent's plan doesn't evidence the conduct of the contracting parties. The debtor's plan. Is he wrong in saying that that plan does reserve this claim? Excuse me? Your opponent represented, I think, that that seventh plan, which that's why I said I don't have it. Yes. That it did reserve this claim. The seventh plan was confirmed nearly a year after the bankruptcy settlement was entered into between Union Pacific and ASARCO. And as such, it couldn't reserve a claim that was already released and settled. It couldn't breathe life back into it. OK, yeah. Obviously, if it had been released, but we're trying to figure out whether or not it had been released. And he's saying that as evidence of what at least we all we thought back then look to the conduct after the settlement was reached. And the conduct of the debtor, the party that negotiated the agreement with Union Pacific, is reflected in the sixth amended plan of reorganization where it preserved no claims against Union Pacific. And to your Honor's point with regard to what the focus of the release and the scope of the proofs of claim, Union Pacific brought a contribution action. And that was the action that was resolved in the bankruptcy settlement. The contribution action asserted by Union Pacific was that it had incurred more costs than it was was obligated to pay in OU3. But he said that, no, it was with respect to, I can't remember North or South work because I get them confused. But right. He's saying that, no, no, no. Your guys' claim related to a totally different part of this larger area than the claim that they're now trying to bring against you. Well, we included, and it was a jointly stipulated exhibit, trial exhibit, supplemental excerpt of record 84. It's the map. And the area that the Starcoast Council is addressing is not in the site. The North Fork Basin was determined by EPA to be clean, not require, they requested the district court in 2000 to remove the North Fork from the site because the North Fork was determined to be clean. It meets all state water quality standards. Even in 1930, it was determined to have a very healthy fishery by Dr. Ellis, and that evidence was in the record. So the costs that Union Pacific incurred were incurred in OU3. They were along the main line, which parallels the South Fork. But all of the testimony about the North Fork was, one, hotly disputed in the trial. And secondly, Union Pacific successfully disputed that there was never an environmental issue there because EPA didn't include it in the site. They excluded it. And the water quality is good. So a Starco did not meet its burden of proof to show that Union Pacific had any releases in the North Fork that resulted in contamination in OU3. And in the bankruptcy settlement, Union Pacific brought a contribution claim saying it had overpaid. A Starco agreed, and the parties equitably allocated their responsibilities, their liabilities between the two of them, with a Starco agreeing to pay $1.8 million to Union Pacific to resolve that. And that is also compelling, and the court found that the release covered that issue. A Starco's contribution claim in this case clearly arises out of, or is in any way connected to, the CDA site and the costs incurred by Union Pacific at the CDA site raised by Union Pacific in its proofs of claim. And as such, the court said the release, one, met Texas law of mentioning because it mentioned the contribution claim, and two, that the scope of the settlement was defined by that, the consideration offered in the release, which was a broader scope than the narrow scope that was limited to the proofs of claim in the recitals. The settlement agreement also states in its body that it was going beyond the proofs of claim. In section four, it states that the claims settled were in quote, including but not limited to the liabilities and other obligations asserted in the proofs of claim. So the bankruptcy settlement itself stated that it went beyond the proofs of claim. These factual issues that opposing counsel is raising today were the exact extrinsic evidence that the district court took days of testimony on and did exactly what this court directed the district court to do, being weighing that competing extrinsic evidence and reach the conclusion, the finding that ASARCO released its claim in the bankruptcy settlement. And that claim could not be revived by the parents' later confirmed plan. If I may turn to, so Union Pacific requests that the court affirm that independent holding, and then turning to the contribution payment itself, independently, the court found that ASARCO wasn't entitled to contribution because it did not overpay its own share of the overall liability for operable unit three. The court found again, after extensive testimony and the several days and documentary evidence, thousands of pages of cost information, that the total cost of the estimated cost of the OU3 remedy was $2.05 billion. And the court also found that the amount that ASARCO paid in response costs was $414,643,000 and simply using that number as a numerator and the total cost as the denominator, that yields that ASARCO paid just over 20% and not its 22% share that had been adjudicated in prior litigation. And I will say that that 22% is a share of liability that ASARCO embraced throughout the bankruptcy in the bankruptcy estimation hearings. It embraced it in the joint stipulated facts in the trial below and in all the testimony within the trial. So there was certainly substantial evidence with respect to that. Turning to the total costs of response for OU3. Before you get to that, can I just ask the legal premise of that analysis on the part of the district court seems to have been that if ASARCO paid less than its share as against the world, then it's not entitled to anything, but doesn't the court need to look at what Union Pacific's liability is in order to make some comparison of the liability of the two entities that are parties to this contribution action? And didn't it, it seems like it sort of skipped that step. Yes, Your Honor. Thank you. Overpayment is a foundational requirement to maintain a contribution claim. Contribution, the term itself is not defined in Circle 113F, but it was defined by the United States Supreme Court in United States versus Atlantic Research Corporation. And that definition has been adopted, of course, by this court in the Whittaker case. And there the Supreme Court stated that the term contribution should be given as traditional meaning. And it means that the tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share. So there must first be, well, the elements are there must be an overpayment. You're getting that from, I mean, a proportionate share that sort of begs the question, which is, is it in proportion to the total damage incurred by the world or in proportion to the liability of the other party to the action? It's the proportionate share of liability for that particular site that is being contribution claims are being asserted over. And the proponent of the contribution, ASARCO, had an obligation to prove by a preponderance of the evidence that it overpaid, that Union Pacific was a co-liable party, and that Union Pacific had not paid its fair share. And what the district court found was that ASARCO did not meet that burden of proof. So ASARCO is the one that skipped over the overpayment question. The district court, there's nothing in the statute or in the case law that says, as to those three elements, the order that they must be addressed in. So even if the district court had issued findings with respect to Union Pacific's liability, ASARCO still didn't meet the overpayment requirement, and therefore the outcome would have been the same. So the overpayment question is fundamental, foundational to maintaining a contribution claim, and the court properly disposed of the issue by resolving that because the prior litigation, as well as evidence presented at this trial, provided sufficient information for the district court to make the determinations with respect to each of the primary cost factors to determine that ASARCO did not meet its burden of overpayment. Okay. Thank you very much. Let's put two minutes, I guess. Yeah. Thank you, Your Honors. So unfortunately, and it's difficult for me to say this, Union Pacific has not, has failed to deal forthrightly with the evidence and the hard truth that the district court made two very significant errors. The district court was not free to abandon CERCLA Section 113. It's a statutory framework that many lawyers that came before me and many lawyers that will come after me have worked very hard to establish. We know from the case law that CERCLA was hard to apply because of the way that it was drafted, but we have a jurisprudence which establishes the framework, and that framework requires a finding of liability and an equitable allocation, an equitable allocation. And neither of these things did not occur in this case. Now the issue of costs and cost calculations have come up, so I do need to say that the district court was not free to rely upon hearsay evidence in establishing the total cost for the cleanup of this site as a part of its formula. The district court was not free to deduct $70 million from the amount that ASARCO paid, the $485 million that ASARCO paid to address the environmental issues, to stop the litigation, to voluntarily pay it so that human health and the environment could be protected. The district court deducted that sum from the $485 million that has been used as necessary response costs by the trust. I would just conclude, Your Honor, by saying we all want to win. That's understood, but we have to look beyond winning and losing today. And we have to think about what will happen to a very important, our most important environmental statute in this country to protect human health and the environment. If we disregard the statutory framework that courts have guided us with as to how CERCLA contribution claims should be handled in the district courts, then parties like businesses will not have any kind of certainty in knowing that if they volunteer the money, if they put it into the communities to address the environment, they will not be able to pursue contribution because district courts won't follow the framework that they are required to follow. And that removes the incentive for businesses to go ahead and pay the sums to address the environmental issues and in so doing to protect human health and the environment. Thank you very much, counsel. Appreciate the helpful arguments in this very complicated case. Case just argued is submitted and we are in recess until tomorrow.
judges: Watford, Miller, Rothstein